AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Jose Manuel CHAVEZ Zepeda and Denis Zacarias PONCE Castillo | ) | |
| | ) | |
| | ) | |

**FILED**

**Mar 14, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

2:22-mj-0045 DB

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _April 22, 2016 through the present date_ in the county of _Sacramento_ in the _Eastern_ District of _California_, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|

COUNT ONE – 21 U.S.C. §§ 841(a)(1) and 846 - Conspiracy to Distribute and Possess with Intent to Distribute at least 500 grams of a Mixture and Substance containing Cocaine (April 22, 2016 through the present)

COUNT TWO – 21 U.S.C. § 841(a)(1) - Distribution of at least 500 grams of a Mixture and Substance containing Cocaine (June 25, 2021)

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_/s/ Orcina Pacheco-Garcia_
_Complainant's signature_

FBI Special Agent Orcina Pacheco-Garcia
_Printed name and title_

Sworn to me and signed telephonically.

Date: _03/14/2022_

City and state: _Sacramento, California_

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT AND CRIMINAL COMPLAINT

I, Orcina Pacheco Garcia, Special Agent with the Federal Bureau of Investigation (FBI), being

  duly sworn, depose and state as follows:

### Background and Expertise

1. I am a Special Agent with the FBI. I entered on duty at the FBI Academy in Quantico,

Virginia, in March 2019. I am currently assigned to the Sacramento Strike Force. I have

been assigned to this squad since 2022.

2. During the course of my employment as an FBI Special Agent, I have participated in

numerous criminal investigations. I have worked for the FBI in other capacities since

September 2017. Based on my training and experience as an agent with the FBI, I have

investigated federal criminal violations related to, among other things, narcotics

trafficking, child exploitation and child pornography, kidnappings, and human trafficking.

I have participated in numerous investigations involving the use of federal and state search

warrants to collect evidence, including controlled substances, the seizure of narcotics-

related records, and other types of evidence that document the activities of criminal

organizations in both the manufacturing and distribution of controlled substances and

weapons.

3. I am an "investigative or law enforcement officer" of the United States within the

meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered

by law to conduct criminal investigations and make arrests for offenses enumerated in 18

U.S.C. § 2516.

4. Because this affidavit is submitted for the limited purpose of establishing probable

cause for the requested complaint, search and arrest warrants, I have not included each and

every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

5. This affidavit is based upon my own personal knowledge and upon the knowledge of other law enforcement officers involved in this investigation. Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is described in sum, substance, and relevant part.

## Scope of Requested Search Warrants

6. This affidavit is submitted in support of an application for warrants to search the locations and vehicles further described below and in **Attachments A-1** through **A-17**. The contraband, objects, and information for which we will search are described in **Attachment B**. Attachments A-1 through A-17 and Attachment B are incorporated by reference.

7. This Affidavit is submitted in support of warrants to search the following locations, telephones, and vehicles:

    a.    The residence located at **3505 Condor Court, Carmichael, California** ("**Target Location 1**"), residence of Jose CHAVEZ as described in Attachment A-1;

    b.    The business located at **2533 Del Paso Boulevard, Sacramento, California, known as La Victoria Supermercado,** ("**Target Location 2**"), business of Jose CHAVEZ described in Attachment A-2;

    c.    The residence located at **2556 Rio Linda Boulevard, Sacramento, California** ("**Target Location 3**"), suspected drug stash house controlled by Jose CHAVEZ, described in Attachment A-3;

d.   The residence located at **2480 Larkspur Lane, #176, Sacramento, California** (**"Target Location 4"**), residence of Denis PONCE described in Attachment A-4;

e.   The residence located at **1412 Thomasnell Way, Ceres, California ("Target Location 5")**, residence of Mario GONZALEZ as described in Attachment A-5;

f.   Jose CHAVEZ telephone: 916-841-4806 (**TT1**), subscribed to Jose Zepeda, 3505 Condor Court, Carmichael, CA.

g.   Denis Zacarias PONCE'S telephone: 916-840-0486 "(**TT2**), subscribed to Denis PONCE, 5717 Hillsdale Boulevard, Sacramento, CA;

h.   Mario Naranjo GONZALEZ'S telephone: 209-416-8448 (**TT3**), subscribed to GONZALEZ at 1412 Thomasnell Way, Ceres, CA.

i.   The following vehicles:

1.   2018 Volkswagen sedan, white with CA license **8HKN876** (**"Target Vehicle 1"**), as described in Attachment A-6.
   a.   Registered to Jose Zepeda, 3505 Condor Court, Carmichael, CA
   b.   Driven by Jose CHAVEZ

2.   2016 Honda sedan, grey with CA license **#8MHH330** (**"Target Vehicle 2"**), as described in Attachment A-7.
   a.   Registered to Jose M CHAVEZ, 3505 Condor Court, Carmichael, CA
   b.   Driven by Jose CHAVEZ

3.   2020 Honda SUV, black with CA license **#8NKA590** (**"Target Vehicle 3"**), as described in Attachment A-8.
   a.   Registered to Jose M Zepeda or Nidia Chavez, 3505 Condor Court, Carmichael, CA
   b.   Driven by Jose CHAVEZ

4.   2017 Honda Sedan, silver with CA license **#8KIV189** (**"Target Vehicle 4"**) as described in Attachment A-9.
   a.   Registered to Chavezzepeda Jose Manuel, 3505 Condor Court, Carmichael, CA
   b.   Parked at **Target Location 1**, Jose CHAVEZ residence.

5.   2017 Honda Accord, grey with CA license **#7UWH104** (**"Target Vehicle 5"**), as described in Attachment A-10.
   a.   Registered to Denis Castillo, at 7987 Old Winding Way, Fair Oaks, CA
   b.   Driven by Denis PONCE

3

6. 2007 Saturn, grey with CA License #**6WCJ577** ("**Target Vehicle 6")** as described in Attachement A-11.
   a. Registered to Registered to Denis Ponce Castillo, at 3825 Presidio St, Sacramento, CA
   b. Driven by Denis PONCE

7. 2008 Toyota, black with CA License #**81749E3** ("**Target Vehicle 7")** as described in Attachement A-12.
   a. Registered to Registered to Denis Ponce, at 3825 Presidio St, Sacramento, CA
   b. Driven by Denis PONCE

8. 2021 Toyota Camry, white with CA license #**8UHG728** ("**Target Vehicle 8**"), as described in Attachment A-13.
   a. Registered to Mario Naranjo, at 1412 Thomasnell Way, Ceres, CA
   b. Driven by Mario GONZALEZ

9. 2017 GMC, red truck with CA license #98560C2 ("**Target Vehicle 9**"), as described in Attachment A-14
   a. Registered to Mario Naranjo, at 1412 Thomasnell Way, Ceres, CA
   b. Driven by Mario GONZALEZ

10. 2007 Toyota, silver Tacoma, CA license # 36821B3 ("**Target Vehicle 10")** as described in Attachment A-15
    a. Registered to Jose CHAVEZ, at 3505 Condor Court, Carmichael, CA
    b. Driven by Jose CHAVEZ

11. 1994 Jaguar, CA license # 3KST304, **("Target Vehicle 11")** as described in Attachment A-16
    a. Registered to Jose CHAVEZ, at 3505 Condor Court, Carmichael, CA
    b. Parked at **Target Location 3**

12. 1998 Ford, truck CA license #8V96908 ("**Target Vehicle 12")** as described in Attachment A-17
    a. Registered to Jose CHAVEZ, at 2533 Del Paso Blvd., Sacramento, CA
    b. Driven by Jose CHAVEZ
    c. Parked at **Target Location 3**

8.   I request authority to search Target Locations 1 through 5 and Target Vehicles 1 through 12 for the items described in Attachment B.

**Scope of Requested Criminal Complaint**

9.   This affidavit also supports an application for a criminal complaint and arrest warrants for:

      a)      Jose Manuel CHAVEZ Zepeda
          (Counts 1-2)

      b)      Denis Zacarias PONCE Castillo
          (Counts 1-2)

| | |
|---|---|
| COUNT ONE – | Conspiracy to Distribute and Possess with Intent to Distribute at least 500 grams of a Mixture and Substance containing Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  (April 22, 2016 through the present) |
| COUNT TWO – | Distribution of at least 500 grams of a Mixture and Substance containing Cocaine, in violation of 21 U.S.C. § 841(a)(1)  (June 25, 2021). |

**Statement of Probable Cause**

10.   The United States Government, including FBI, has been investigating the drug

trafficking activities of Jose Manuel CHAVEZ Zepeda, Denis Zacarias PONCE Castillo,

and Mario Naranjo GONZALEZ since April 2016.

11.  In 2016 and 2017, an FBI confidential human source (the "CHS"), provided

information about Jose CHAVEZ.[1]   The CHS had previously delivered multiple kilograms

---

[1] The CHS has a criminal history that includes a prior felony conviction for a drug trafficking offense.  The CHS is cooperating with the FBI in the hopes of receiving assistance with the CHS's immigration status.  The FBI has been working with the CHS since April 2016.  During that time, the FBI has not identified any issues of dishonesty with the CHS.  Agents have been able to independently corroborate much of the information provided by the CHS related to the drug trafficking activities of CHAVEZ through surveillance, phone records, audio

("kilos") of cocaine to CHAVEZ's sub-dealers in the Sacramento, California ("CA") area.
The CHS also provided the following information:

      a)      CHAVEZ's cocaine Source of Supply (hereinafter "SOS") is an individual
he called "Compadre," who resides in Mexico.  The CHS believes CHAVEZ and
Compadre are very close.  Compadre is connected to the Cartel Jalisco Nuevo
Generacion, or "CJNG."  The cocaine the CHS would deliver would be marked with the
"NG" (for Nuevo Generacion) stamp on them.

      b)      Compadre arranges for the cocaine to be smuggled into the United States
and transported to Los Angeles, CA.  The cocaine is smuggled into the United States in
semi-trucks transporting other goods.  Once the cocaine reaches Los Angeles, it is then
loaded into smaller Nissan trucks and driven to an individual known as "Joto" in Ceres,
CA.  Sometimes "Joto" would drive to southern CA to pick up the cocaine.  The CHS
positively identified "Joto" as Mario Naranjo GONZALEZ via DMV photograph.

      c)      GONZALES drove a white Ford truck with a false compartment installed
in it.  The CHS ran special errands for CHAVEZ and delivered $230,000, $100,000, and
$80,000 cash, all on separate occasions, to GONZALEZ, who was also storing cocaine
on behalf of CHAVEZ (as well as delivering narcotic proceeds back to the SOS).  The
CHS stated the $230,000 was the proceeds from one week of narcotic sales.
GONZALEZ stored the money he received in his garage until he was ready to take it
down to Mexico.

      d)      GONZALEZ previously told the CHS that he stored the narcotics (for
CHAVEZ) at his (GONZALEZ's) aunt's house.

---

recordings, and other information.  I am not aware of the CHS providing false or misleading
information during this investigation.  For these reasons, I believe the information provided by
the CHS to be reliable.

e)      The CHS stated that when someone in Sacramento, CA needed cocaine, the CHS would pick it up from GONZALEZ and deliver it to the person who needed it.

f)      In July 2021, the CHS stated that Compadre used to supply GONZALEZ with cocaine and then GONZALEZ would be the SOS for CHAVEZ.  At some point, CHAVEZ went directly to Compadre and started getting cocaine directly from him.  This upset GONZALEZ.  Compadre told CHAVEZ and GONZALEZ that they needed to work together.  After that, CHAVEZ and GONZALEZ ordered their cocaine from Compadre together and made their payments together (bundling narcotics orders and payments together).

g)      CHAVEZ would sell kilos of cocaine for $28,000 - $30,000.

h)      One of CHAVEZ's larger sub-dealers was a Central American guy known as "El Ciego," "Casi Miro," or "El Tuerto," who works at a mechanic shop.  The CHS would deliver cocaine to "El Ciego" at the mechanic shop where he works.  The CHS had previously communicated with "El Ciego" on telephone number 916-821-5489 (hereinafter "x5489") but did not believe that the number was still being used.  In May 2021, the CHS positively identified "El Ciego" as Denis Zacarias PONCE Castillo using a social media photograph.

i)      The CHS believes CHAVEZ stores the proceeds from his narcotic sales in his bedroom closet at his house.  CHAVEZ uses a shrink wrapper in his room to shrink wrap the money into bundles of $100,000.

j)      As of June 2021, the CHS communicated with CHAVEZ on telephone number 916-841-4806 (hereinafter "**TT1**").

k)      CHAVEZ currently owns and operates La Victoria Supermercado, located at 2533 Del Paso Boulevard, Sacramento, CA (**Target Location 2**).  CHAVEZ uses this grocery store to launder proceeds from his narcotic sales.  The CHS has direct knowledge of the business dealings inside La Victoria Supermercado.  CHAVEZ is believed to be

7

laundering narcotics sale proceeds (through money remitters, bulk cash deposits, and business proceeds) to affiliates in Mexico.

## Arrangements for the Purchase of Cocaine on June 25, 2021

12.   According to the CHS, on June 8, 2021, CHAVEZ spoke with the CHS in person. CHAVEZ offered to sell the CHS a half kilogram or quarter kilogram of cocaine as someone else had requested a half kilogram as well.

13.   On June 15, 2021, the CHS told the FBI that the CHS met with CHAVEZ in November 2020 or December 2020 at La Victoria Supermercado.  PONCE arrived at the location and gave an unknown amount of money to CHAVEZ.  CHAVEZ later told the CHS that PONCE, whom CHAVEZ trusted a great deal, was the "stash pad" manager (for their cocaine).

14.   According to the CHS, on June 17, 2021, the CHS went to La Victoria Supermercado to meet with CHAVEZ.  CHAVEZ exited the market and entered his truck where the CHS and CHAVEZ discussed the purchase of cocaine.  CHAVEZ stated he was willing to sell the CHS half a kilogram of cocaine. CHS would be paying $7,000.00 for a quarter kilogram of cocaine and owing CHAVEZ for the remaining quarter kilogram.

15.   On June 24, 2021, law enforcement officers monitored and recorded the CHS engaging in narcotics related meeting with CHAVEZ and PONCE during which the CHS discussed the purchase of cocaine.  The CHS met with CHAVEZ and PONCE at La Victoria Supermercado (**Target Location 2**). The CHS, CHAVEZ and PONCE discussed the purchase of cocaine in the CHAVEZ's office inside **Target Location 2**.  CHAVEZ informed PONCE that the CHS was interested in purchasing half a kilogram of cocaine. PONCE then stated they would need to call the other guy.  PONCE then placed a telephone

call and spoke with an unidentified person for approximately 2 to 3 minutes.  At the conclusion of the telephone call, PONCE said it was good.  Based off the series of events, the CHS believed that PONCE had called the other guy and confirmed that he wanted the other half kilogram of cocaine.  The CHS was instructed to call PONCE on 916-840-0486 ("**TT2**") on June 25, 2021 at around 7:00am and he would sell him the half kilogram of cocaine.  PONCE provided the CHS with his address, 1051 Fulton Avenue in Sacramento, CA, as the location to meet him in the morning to pick up the cocaine.

## Controlled Purchase of 508.5 Grams of Cocaine from CHAVEZ and PONCE on June 25, 2021

16.  On June 25, 2021, agents established physical surveillance at his residence at 2480 Larkspur Lane, Sacramento, California (**Target Location 4**).  Agents observed PONCE leave the condominium complex and after some stops arrived at 4158 Scranton Circle, Sacramento, CA.  At the time, 4158 Scranton Circle was the known residence of CHAVEZ.  **Target Vehicles 2, 3** and **4** were observed outside of the residence.  Agents witnessed CHAVEZ park **Target Vehicle 2** in front of the residence and enter the residence.  PONCE later exited the residence.  The CHS placed a recorded call to PONCE after PONCE was witnessed exiting the residence. PONCE immediately responded, in Spanish, with "I am now ready."[2]  The CHS and PONCE then agreed to meet at **Target Location 2.**  Prior to the CHS's arrival, officers searched the CHS for contraband with negative results, and outfitted the CHS with a recorder and transmitter.

---

[2] I am a native Spanish speaker.  I reviewed the Spanish language recording and translated it into English.

17.   The CHS received an incoming call from PONCE's telephone number, **TT2**.  PONCE asked for the CHS's estimated time of arrival. The CHS and PONCE exchanged the following text messages:

*PONCE: Estoy Afuera (I am outside)*

*CHS: Aqui estoy yo en el carro blanco. Que carro traes tu? (I am here in the white car. What car are you in?)*

Agents observed PONCE approach the CHS's driver side window. PONCE handed a brown bag to the CHS. PONCE in exchange, received the $7,000.00 from the CHS.

18.  After the meeting, the CHS immediately met with agents and turned a brown bag containing the cocaine and the recording devices. The cocaine was subsequently analyzed by the DEA Laboratory, where it tested positive for cocaine and was found to weigh 508.5 grams net weight.

### Cocaine Debt Payment of $4,000 to CHAVEZ on July 16, 2021

19.  On July 16, 2021, law enforcement officers monitored and recorded the CHS engaging in a narcotics related meeting at La Victoria Supermercado (**Target Location 2**), where the CHS had planned to meet with CHAVEZ to conduct a partial payment for the cocaine purchased on June 25, 2021.  A detective observed a silver Toyota Tacoma with CA license plate 36821B3 ("**Target Vehicle 10**") (registered to CHAVEZ) in the parking lot of La Victoria Supermercado.  A detective observed **Target Vehicle 7** (registered to PONCE) parked in the rear of 2566 Rio Linda Boulevard, Sacramento, CA (**Target Location 3**). The residence at **Target Location 3** is located across the street from the rear of La Victoria Supermercado. As further explained below, **Target Location 3** is believed to be controlled by CHAVEZ and to be a drug stash location.  When the CHS arrived at the Market,

CHAVEZ was exchanging checks for a long line of customers. The CHS had to wait a while to talk to CHAVEZ. While the CHS was waiting, PONCE walked into the Market unexpectedly. Once CHAVEZ was done with the customers, CHAVEZ, PONCE and the CHS entered the office together.  The CHS observed PONCE enter the office holding small pieces of paper and, according to the CHS, PONCE stated "with this we are going to be good."  The CHS then CHAVEZ and PONCE discuss a new delivery of cocaine and CHAVEZ encouraged the CHS to purchase more (cocaine) from them.  CHAVEZ instructed PONCE to pick up two (presumably kilos of cocaine) as soon as possible. CHAVEZ encouraged PONCE to leave right away and PONCE stated he was tired. CHAVEZ told PONCE to go first thing in the morning.  After PONCE left the office, the CHS told CHAVEZ he only had $4,000.00 as a payment.  CHAVEZ took the money from the CHS, counted it, and stated it was not a problem.  CHAVEZ told the CHS that "Joto" (GONZALEZ) had sold his food truck, purchased a bar, called La Huacana, but had since sold it.

20.  I reviewed the recording on July 16, 2021, in which the CHS and CHAVEZ spoke in Spanish. The following is only a summary of what I observed and heard in the recording. The CHS handed CHAVEZ the money and CHAVEZ asked the CHS if they liked it. CHAVEZ asked if the CHS noticed the marking, and the CHS stated he saw the number "68" on the packaging.  CHAVEZ stated "I only did this" and made a gesture with his hands as if he was splitting something in half.  The CHS asked if the number (on the packaging) was in reference to the purity of the cocaine.  CHAVEZ stated no, and that the cocaine he received was assigned a number.  He further explained that if there was ever an issue with the cocaine, CHAVEZ would reference the number on the cocaine.  He said that

everyone who has a "line" has numbers assigned to the cocaine they manage.  CHAVEZ

mentioned that on the last shipment, he had to return one, referring to a kilogram of

cocaine. CHAVEZ stated he spoke to "Compadre" about the cocaine. CHAVEZ made

statements regarding the "beauty" and pureness of the cocaine.  He also stated that he

himself split it. CHAVEZ stated he gave the cocaine to the CHS as he had received it aside

from splitting it. CHAVEZ stated he never splits them (referring to the kilogram packages

of cocaine) and that he typically always sells them whole. CHAVEZ encouraged the CHS

to purchase a whole kilo of cocaine verses the half.  CHAVEZ stated the CHS would make

more money that way.  After the meeting, the CHS immediately met with agents to turn

over the recording devices.  Based on my training and experience, I believe that CHAVEZ

was referring to a kilogram package of cocaine, numbered "68," which he split in half to

sell to the half kilogram to the CHS on June 25, 2021.

### PONCE Travels to the Area of GONZALEZ's Residence (Target Location 5) on July 17, 2021, Apparently to Pick Up Two Kilograms of Cocaine at CHAVEZ's Direction

21.  The next day, on July 17, 2021 (the next day), geolocation data for **TT2** (PONCE)

indicates **TT2** traveled to Ceres, CA.  Geolocation data on **TT2** indicates **TT2** was in the

proximate area of 1412 Thomasnell Way, Ceres CA (**Target Location 5**), GONZALEZ's

address per public database inquiries.  Geolocation data on **TT2** indicates **TT2** was in

Ceres, CA for a short period of time (from approximately 3:29pm to 3:44pm) prior to

returning to the Sacramento, CA area.  Based on my training, experience, and knowledge

of this investigation, I believe PONCE likely traveled to Ceres to pick up two kilograms of

cocaine from GONZALEZ at CHAVEZ's direction.

22.  On July 20, 2021, agents obtained the CA Secretary of State electronic filing for La Huacana, Inc.  In summary, La Huacana, Inc. is a night club and bar, located at 101 E Glenn Avenue #A, Modesto, CA 95358.  The filing date was July 24, 2020, with the Chief Executive Officer, Secretary, Chief Financial Officer, Director, and Agent of Service of Process all listed as Mario Naranjo GONZALEZ at 1412 Thomasnell Way, Ceres, CA (**Target Location 5**).  The electronic signature listed Mario N GONZALEZ.

23.  A public records database inquiry on GONZALEZ revealed a possible telephone number of 209-416-8448 (**TT3**).  Subscriber information showed **TT3** listed as subscribed to Mario GONZALEZ, located at 1412 Thomasnell Way, Ceres, CA.  Toll analysis on **TT1** (CHAVEZ) revealed communication with **TT3** (GONZALEZ) on May 6, May 9, May 10, and June 17, July 8, July 14 through July 16, and July 28 (all of 2021).[3]  Agents later obtained a WhatsApp pen register (starting on August 14, 2021), which shows dozens of additional communications between **TT1** and **TT3**.

### Cocaine Debt Payment of $3,000 to CHAVEZ and PONCE on July 22, 2021

24.  On July 22, 2021, law enforcement officers monitored and recorded the CHS engaging in a narcotics related meeting at La Victoria Supermercado (**Target Location 2**), where the CHS had planned to meet with CHAVEZ for the final payment of the cocaine purchased on June 25, 2021. The following information was provided by the CHS when the CHS was debriefed after the payment to CHAVEZ was completed.[4]  Once inside of the market,

---

[3] On July 16, 2021, CHAVEZ told the CHS that he had not been in communication with GONZALEZ for a while.  Based on these toll communication and PONCE's trip to Ceres on July 17, 2021, apparently to pick up two kilograms of cocaine from GONZALEZ, I believe CHAVEZ was misleading the CHS about his recent communications with GONZALEZ.

[4] Due to the rustling of the recording device, some of the recording is difficult to understand.

CHAVEZ and the CHS entered the office inside the market. The CHS noticed PONCE sitting inside of the office.  The CHS handed CHAVEZ $3,000.00.  CHAVEZ asked the CHS when he would be purchasing more and stated he was ready to supply the CHS. CHAVEZ stated he was receiving approximately five to six (kilograms) each delivery, which the CHS understood to be weekly.  CHAVEZ further stated the cocaine he was getting was good quality. The CHS left when PONCE got up to leave and said goodbye to both CHAVEZ and the CHS.  After the meeting, a detective observed the CHS greet PONCE in the parking lot. PONCE then accessed **Target Vehicle 5**, walked to the rear of the residence located at 2556 Rio Linda Boulevard (**Target Location 3**), opened the gate, and got into **Target Vehicle 6** and moved it off of the property through the same gate. PONCE then exited **Target Vehicle 6**, closed the gate, returned to **Target Vehicle 6,** and departed.

### Additional Evidence of CHAVEZ's and GONZALEZ's Joint Narcotics Trafficking Activities

25.  In June 2021, agents conducted law enforcement database inquiries with the Department of Homeland Security (hereinafter "DHS") relating to known vehicles registered to CHAVEZ. The license plate inquires revealed the following:

    a)  CA license plate 36821B3 crossed the U.S. / Mexico border on February 27, 2021 and March 24, 2021. The operators of the vehicle during those crossings were Katie Vanesa CAMPOS (February 27, 2021) and Uriel DELREAL (March 24, 2021).

b) CA license plate 8KIV189 (**Target Vehicle 4**) crossed the U.S. / Mexico border on March 27, 2021 and April 6, 2021. The operator of the vehicle during those crossings was Celeste CAMPOS.

26.  Further law enforcement database inquiries with DHS on K. CAMPOS, C. CAMPOS, and DELREAL revealed the following:

a) DELREAL crossed the U.S. / Mexico border approximately 170 times in 2021. Of specific interest, DELREAL crossed the U.S. / Mexico border on February 16, 2021 in a vehicle with CA license plate 8T83538. A DMV inquiry on CA license plate 8T83538 revealed the vehicle was a 2010 Ford truck previously registered to Mario Naranjo, located at 1412 Thomasnell Way, Ceres, CA (**Target Location 5**). There was a release of liability on the truck dated November 26, 2019, with the new registered owner listed as Jose Lopez Chavez, located at 2533 Del Paso Boulevard (the address for La Victoria Supermercado, **Target Location 2**).

b) C. CAMPOS crossed the U.S. / Mexico border approximately 50 times in 2021.

c) K. CAMPOS crossed the U.S. / Mexico border approximately 85 times in 2021.

d) It should also be noted that DELREAL, C. CAMPOS, and K. CAMPOS were listed as both vehicle operators and sometimes passengers while one of the others were driving. For example, on March 26, 2021, C. CAMPOS was operating a vehicle that crossed the U.S. / Mexico border, and DELREAL was a passenger in the vehicle.

e) A law enforcement database inquiry on CA license plate 8T83538 revealed it was a white Ford F-150.

15

f) Based on my training, experience, and knowledge of the investigation, I believe the 2010 Ford F-150 with CA license plate 8T83538 is likely the vehicle containing a hidden compartment that was described by the CHS. I the previous registered owner, Mario Naranjo, is GONZALEZ. Additionally, DMV records reveal that the current registered owner, Jose Lopez Chavez is CHAVEZ. Based on the totality of information, I believe that GONZALEZ, DELREAL, C. CAMPOS, and K. CAMPOS are involved in this drug trafficking organization ("DTO").

27.  On July 27, 2021, court-authorized geolocation data for **TT3** (GONZALEZ) indicates **TT3** was in the area of La Victoria Supermercado (**Target Location 2**).  At around 5:35 p.m., surveillance observed GONZALEZ's 2017 GMC truck with CA license plate 98560C2 in the parking lot of La Victoria Supermercado.  Court-authorized geolocation data for **TT1** (CHAVEZ) indicates **TT1** was also in the area of La Victoria Supermercado. Geolocation data for **TT3** indicates **TT3** was in the area for approximately 2.5 hours prior to returning to the area of GONZALEZ's residence in Ceres (**Target Location 5**).  A law enforcement database inquiry on CA license plate 98560C2 revealed the vehicle had scanned in the Sacramento, CA at 5:20 p.m. near La Victoria Supermercado, and then again at 10:36 p.m. at the same prior scan location (while geolocation for x8448 was in Ceres, CA).  Geolocation data for **TT1** indicates **TT1** was in the same proximate area as the license plate scan at 10:36 p.m. (indicating that CHAVEZ likely had possession and control of GONZALEZ's vehicle).  At approximately 10:48 p.m., geolocation data for **TT3** (GONZALEZ) indicates **TT3** travelled to Vancouver, Washington ("WA"), arriving in the mid-afternoon on July 28, 2021.  Geolocation data for **TT3** indicates **TT3** remained in

16

Vancouver, WA for approximately 6 hours prior to returning to the area of GONZALEZ's residence (on July 29, 2021).  On July 29, 2021 at around 3:13p.m., a law enforcement database inquiry on CA license plate 8UHG728 (registered to GONZALEZ) (**Target Vehicle 8**) revealed the vehicle scanned in the same proximately location as geolocation data for **TT3** (while returning to Ceres, CA).  Based on the foregoing, I believe GONZALEZ traveled to Vancouver, WA in **Target Vehicle 8**.

28.  On September 8, 2021, GONZALEZ traveled to Vancouver, WA, where he remained for approximately 3.5 hours, prior to returning to the Ceres, CA area (on September 9, 2021).

a) A WA Narcotic Task Force observed GONZALEZ arrive in an apartment complex located at 2508 NE 138th Avenue, Vancouver, WA at around 7:08 p.m. He was driving **Target Vehicle 8** and was the sole occupant of the vehicle. GONZALEZ carried a white plastic shopping bag with items inside resembling Tupperware containers into apartment A8.  Local law enforcement database inquiries revealed Salvador Campos-Torres, Katherine Campos-Torres, Eduardo Campos-Torres, and Rafael Campos were associated with apartment A8.  During the surveillance, several Hispanic male adults were observed entering the apartment (with GONZALEZ inside) carrying backpacks. All of their stay was short in nature, and when they exited the apartment, they were no longer carrying backpacks. GONZALEZ was observed carrying a backpack inside the apartment during the surveillance, but it appeared to be empty, or close to empty (based off the shape and way the backpack was being carried). When GONZALEZ left the apartment, the backpack appeared to be partially full.

b) Per the Clark / Vancouver Regional Drug Task Force, Rafael Campos is married
to, or in a relationship with, Isela Campos-Gonzalez.  Isela Campos-Gonzalez's
mother is Marisol Torres Cervantes.  On April 17, 2020, Oregon State Police
conducted a vehicle stop on a 2019 Nissan Rogue registered to Isela Campos-
Gonzalez.  The driver and sole occupant of the vehicle was Marisol Torres
Cervantes.  A consent search of the vehicle revealed a manufactured floor
compartment and approximately 7 pounds of cocaine and 4.5 grams of heroin.
Insurance identification cards located inside the vehicle showed that Isela
Campos-Gonzalez and Rafael Campos-Barajas were insured on the vehicle.

29.  On October 14, 2021, court-authorized geolocation data for **TT3** (GONZALEZ)
indicates **TT3** traveled to Vancouver, WA, where **TT3** remained for approximately four
hours, prior to returning to the Ceres, CA area (on October 15, 2021). A Washington
Narcotic Task Force observed GONZALEZ arrive in an apartment complex located at 2508
NE 138th Avenue, Vancouver, WA at around 3:50 p.m., driving **Target Vehicle 8**.
GONZALEZ carried a pink shopping bag with items inside into an apartment. During the
surveillance, at least one Hispanic male adult was observed entering the apartment (with
GONZALEZ inside) carrying a backpack. The stay was short in nature, and when he exited
the apartment, he was no longer carrying a backpack.

30.  On March 12, 2022, at around 11:05 am, geolocation data for **TT3** (GONZALEZ)
indicates **TT3** left the area of **Target Location 5**(GONZALEZ's residence in Ceres), and
traveled to Sacramento, CA, arriving between 12:20 p.m. and 12:35 p.m. at a location near
**Target Location 1** (CHAVEZ's residence).  Geolocation data for **TT1** (CHAVEZ)
indicates **TT1** was in the area of **Target Location 1** at around the same time. Surveillance

units witnessed PONCE arrive at **Target Location 1, and** GONZALEZ arrived shortly

after.  About six minutes after he arrived, GONZALEZ departed **Target Location 1,**

driving **Target Vehicle 9**.  Less than an hour later, detectives witnessed CHAVEZ,

PONCE and GONZALEZ gathering together in a restaurant parking lot in Sacramento.

They left the location, with GONZALEZ driving **Target Vehicle 9**, and CHAVEZ driving

**Target Vehicle 1** with PONCE as a passenger, and returned to **Target Location 1**

(CHAVEZ's residence).  About 10 minutes later, GONZALEZ and PONCE each left in

their respective vehicles (**Target Vehicles 9 and 6**).

### Money seizure from Mario Naranjo GONZALEZ on October 15, 2021

31.   On October 15, 2021, at 11:54 a.m., the Sacramento County Sheriff's Office

conducted a traffic enforcement stop on **Target Vehicle 8**.  The driver and sole occupant of

the vehicle was identified as GONZALEZ.  A canine, trained in the detection of narcotics,

positively alerted on the vehicle.  A subsequent search of the vehicle revealed two bundles

of cash, wrapped in green saranwrap, hidden underneath the upholstery of the driver's front

seat rear backing, as well as ten additional bundles of cash, wrapped in green saranwrap,

hidden underneath the upholstery of the passenger's front seat rear backing.  GONZALEZ,

who was detained after the canine narcotic alert, was escorted to stand near the marked

patrol vehicle, unhandcuffed.  GONZALEZ initially denied knowing the money was in the

vehicle, or that it belonged to him.  GONZALEZ stated he was coming from Sacramento,

CA and driving to Modesto, CA.  Upon further questioning, GONZALEZ stated that he

was a money courier and that he would make $1,000 to make money courier trips from

Sacramento, CA to Modesto, CA.  GONZALEZ stated that his wife was also a money

courier.  GONZALEZ stated that his telephone number was **TT3**.  A deputy observed that

GONZALEZ had two Android phones in his vehicle at the time of the stop.  GONZALEZ was released from the scene, and the bundles of cash were seized.  A subsequent search and processing of the bundles of cash revealed there was $79,470 in total.

        a)      Based on my training, experience, and knowledge of the investigation, I know "short stay" traffic is an indication of narcotic sales.  I believe GONZALEZ traveled to Vancouver, WA with an undisclosed type and quantity of narcotics, and received $79,470 in cash in exchange for the narcotics.  GONZALEZ then concealed the cash in the seats to avoid detection and apprehension by law enforcement, prior to traveling toward the Sacramento, CA area.

        b)      Prior toll analysis and WhatsApp pen register analysis identified one of GONZALEZ's top contact numbers as 209-918-0164 (hereinafter "x0164").  A law enforcement financial database inquiry on x0164 revealed the number was associated with Griselda Guadalupe Orozco NARANJO at 1412 Thomasnell Way, Ceres, CA.  NARANJO is believed to be the wife of GONZALEZ.

**Money seizure from C. CAMPOS and Julio VEGA on January 27, 2022**

32.  As discussed above, law enforcement checks conducted by DHS revealed numerous U.S. /Mexico border crossings in vehicles belonging to CHAVEZ and GONZALEZ to include; 2018 Volkswagen license plate 8HKN876 (**Target Vehicle 1**), 2017 GMC license plate 98560C2, and 2017 Honda sedan 8KIV189 (**Target Vehicle 4**).  Border crossings revealed that at various times, the drivers and passengers were K. CAMPOS, DELREAL, and C. CAMPOS.

33.  C. CAMPOS (utilizing telephone number 619-870-7147, "x7147"), K. CAMPOS, and DELREAL have been identified in the investigation as suspected money couriers residing in southern CA and in Mexico for the DTO.

34.  A law enforcement database inquiry with DHS on Mexico license plate WFK-930-A revealed it crossed the Otay Mesa POE on January 24, 2022, at 2:37 p.m., one minute before C. CAMPOS crossed the border.  The driver, Julio Cesar Sanchez VEGA had previously crossed the U.S. / Mexico border with C. CAMPOS on November 24, 2021.

35.  Pen register data on **TT1** (CHAVEZ) indicates **TT1** was in contact with **TT3** (GONZALEZ) on January 24, 2022 at 9:25 p.m.

36.  On January 25, 2022, geolocation data on x7147 (C. CAMPOS) indicated x7147 began traveling northbound on Highway 99 at around 11:00 a.m.  At around 2:15 p.m., the Modesto Police Department conducted a traffic enforcement stop on the blue Volkswagen Jetta with Mexico license plate WFK-930-A.  The two occupants were driver VEGA (identified via B1/B2 Visa) and passenger C. CAMPOS (CA driver's license).  VEGA related he had just rented the Jetta in Mexico (and showed a rental agreement in support of his statement) and stated he was traveling to Sacramento, CA to visit his father's good friend.  A police canine, trained in the detection of narcotics, positively alerted on the trunk of the vehicle.  A subsequent search of the vehicle was met with negative results, and VEGA and C. CAMPOS were released from the scene.

37.  Detectives conducted surveillance on VEGA and C. CAMPOS.  At around 4:15 p.m., detectives observed the blue Volkswagen Jetta with Mexico license plate WFK-930-A pull into the La Victoria Supermercado parking lot (**Target Location 2**).  VEGA and C.

CAMPOS exited the blue Volkswagen Jetta with Mexico license plate WFK-930-A and entered the store. At around 5:15 p.m. surveillance was terminated.

38. Geolocation data on **TT1** (CHAVEZ) indicates **TT1** was at the store when VEGA and C. CAMPOS arrived. At around 5:48 p.m., geolocation data for x7147 indicates x7147 left the store and went to a hotel near I-5 and Richards Boulevard in Sacramento, CA. At around 8:19 p.m., geolocation data for x7147 indicates x7147 traveled to the area of Fair Oaks Boulevard and Howe Avenue in Sacramento, CA, where it remained until around 10:05 p.m. Geolocation data on x7147 indicates x7147 traveled to the area of CHAVEZ's residence (**Target Location 1**) from 10:35 p.m. to 10:50 p.m., prior to traveling back to the area of I-5 and Richards Boulevard in Sacramento, CA. Geolocation data on **TT1** (CHAVEZ) indicates **TT1** left **Target Location 2** at around 8:19 p.m. and responded to the area of Fair Oaks Boulevard and Howe Avenue in Sacramento, CA, where it remained until around 10:05 p.m. Geolocation data on **TT1** indicates **TT1** traveled to the area of CHAVEZ's residence (**Target Location 1**), arriving at around 10:35 p.m., where it remained for the evening.

39. On January 26, 2022 at around 1:57 p.m., geolocation data for x7147 (C. CAMPOS) indicates x7147 traveled from the Sacramento, CA area to the area of **Target Location 5** (GONZALEZ's residence in Ceres), arriving at around 3:28 p.m. Geolocation data on x7147 indicates x7147 remained in the area until around 4:29 p.m. prior to traveling to the Bakersfield, CA area (arriving at around 8:00 p.m.) Geolocation data for x7147 indicates x7147 remained in Bakersfield until January 27, 2022.

40. On January 27, 2022 at around 9:36 a.m., geolocation data for x7147 (C. CAMPOS) indicates x7147 traveled from Bakersfield, CA to San Diego, CA. At around 2:49 p.m., the

San Diego County Sheriff's Department conducted a traffic enforcement stop on the blue Volkswagen Jetta with Mexico license plate WFK-930-A. VEGA was operating the vehicle and C. CAMPOS was a passenger in the vehicle. A consent search of VEGA and the vehicle was conducted, and a total of $71,280 was located. Per the San Diego Sheriff's Department, VEGA stated a portion of the money was proceeds from him selling a vehicle. C. CAMPOS did not have an explanation for the money inside the vehicle. Based on the way the money was packaged (some held with rubber bands, and some plastic sealed) and where it was located, as well as a canine trained in the detection of narcotics alerting on an area where money was located, the San Diego Sheriff's Department Deputy believed the money was proceeds from narcotic trafficking.

### Pen Register Data

41. Pen register analysis on **TT1**(CHAVEZ) indicates **TT1** has been in contact with **TT3** (GONZALEZ) over 20 times between May 6, 2021 and March 3, 2022. Pen register analysis on **TT1** (CHAVEZ) indicates **TT1** has been in contact with **TT2** (PONCE) over 50 times between February 3, 2022 and March 5, 2022. Pen register analysis on **TT2** (PONCE) indicates no communication with **TT3** (GONZALEZ).

### Additional Surveillance of Target Location 1

42. On January 14, 2022, surveillance was conducted on 3505 Condor Court, Carmichael, CA (**Target Location 1**). Agents observed a white Volkswagen, license plate 8HKN876 (**Target Vehicle 1)** registered to Jose Zepeda and a black Honda, license plate 8NKA590 (**Target Vehicle 3**). The registered address for both vehicles is listed as 3505 Condor Ct., Carmichael, CA**.** In March 2022, law enforcement checks conducted on CHAVEZ, listed his current address as 3505 Condor Ct., Carmichael, CA.

23

43.  On February 2, 2022, surveillance was conducted on 3505 Condor Court, Carmichael, CA (**Target Location 1**).  Agents observed a black Honda, license plate 8NKA590 (**Target Vehicle 3**) and white Honda sedan license plate 8KIV189 (**Target Vehicle 4**). Agents observed CHAVEZ leave the front door area of the residence and enter **Target Vehicle 3**.

44.  On March 7, 2022, surveillance was conducted at 3505 Condor Court, Carmichael, CA (**Target Location 1**). Detectives witnessed PONCE arrive at residence driving **Target Vehicle 6.**  PONCE departed the **Target Location 1** and later detectives witnessed **Target Vehicle 1** leave from the garage of the residence.  The sole occupant of **Target Vehicle 1** was identified as CHAVEZ. After departing the residence, CHAVEZ was witnessed arriving at La Victoria Supermercado (**Target Location 2**).

45.  Based on my training, experience, and knowledge of this investigation, I believe CHAVEZ resides at **Target Location 1** and likely uses it as a stash location for illegal drugs and drug proceeds.  Agents believe Nidia Chavez, believed to be CHAVEZ's wife, may also live at **Target Location 1** based on surveillance observations of vehicles co-registered to CHAVEZ and Nidia Chavez in the driveway of the residence.  Agents believe there may be juveniles living at **Target Location 1** based on the surveillance observation of CHAVEZ leaving the residence with two juveniles on February 4, 2022.  Agents have not observed any indication of anyone else living at **Target Location 1**.

### Target Location 3: 2556 Rio Linda, Sacramento, CA

46.  As noted above, the residence at **Target Location 3** is located across the street from the rear of La Victoria Supermercado (**Target Location 2**). **Target location 2** and **3** are separated by an alley way and **Target Location 3** has a black iron gate surrounding the

property.  On March 9, 2022, Sacramento Municipal Utility District (SMUD) revealed utilities were listed under the name of Maria Estela DELGADO.  It is unknown what relationship DELGADO has with CHAVEZ or PONCE.  On March 12, 2022, DELGADO was observed at the residence of **Target Location 3**.

47.  On June 3, 2021, during a surveillance operation, detectives witnessed PONCE exit La Victoria Supermercado (**Target Location 2**) and drive **Target Vehicle 6** to the rear of the supermarket.  Detectives lost sight of **Target Vehicle 6** briefly but observed PONCE closing the metal gate running across the driveway of **Target Location 3**.  **Target Vehicle 6** was located in the yard behind the gate.  Detectives observed two additional vehicles behind the gate: **Target Vehicle 5** (used by PONCE) and **Target Vehicle 11**(registered to Jose CHAVEZ, address 3505 Condor Court, Carmichael, CA), parked in the yard of **Target Location 3.**

48.  As noted above, on July 16, 2021, surveillance saw **Target Vehicle 7** (registered to PONCE) parked at **Target Location 3** during the surveillance related to the CHS's payment of $4,000 in drug proceeds to CHAVEZ at La Victoria Supermercado (**Target Location 2**).  While the CHS was meeting with CHAVEZ to pay the drug proceeds, PONCE came into **Target Location 2** and discussed drug business with CHAVEZ.  Similarly, on July 22, after the CHS met with CHAVEZ and PONCE in the office at **Target Location 2** to pay CHAVEZ $3,000 in drug proceeds, PONCE was observed walking to **Target Location 3**, where he got into **Target Vehicle 6.**

49.  On February 4, 2022, surveillance units witnessed PONCE arrive at **Target Location 2** in **Target Vehicle 6**.  Shortly after, PONCE was seen using a key to enter the gate to

**Target Location 3**.  PONCE was seen walking inside the gated area of the property, as **Target Vehicle 6** blocked the driveway of the residence.

50.  On March 9, 2022, surveillance units witnessed a "Tacos La Victoria" taco truck stationed inside the secured yard of the residence at **Target Location 3**.-On-March 12, 2022, detectives witnessed the same taco truck stationed in the parking lot of **Target Location 2** (La Victoria Supermercado**). Surveillance units also witnessed **Target Vehicle 11** (expired registration; registered to CHAVEZ from 12/14/2017 through 12/14/2018) parked inside of the residence of **Target Location 3**.  Detectives also witnessed **Target Vehicle 12 (**a white box truck, 1998 Ford, CA license plate 8V96908, with current registration dates of 03/31/22 through 03/31/2023, registered to CHAVEZ at **Target Location 2**.  Based on my training and experience and the totality of the evidence, I believe **Target Location 3** is controlled by CHAVEZ and that CHAVEZ is likely using **Target Location 3** as a drug stash location and/or that **Target Location 3** contains evidence of CHAVEZ's and PONCE's drug trafficking activities.[5]

### Target Location 4: 2480 Larkspur Lane, #176, Sacramento, CA

51.  Records produced by Facebook in response to a search warrant for PONCE's Facebook account listed several IP addresses used to log into the account.  A subpoena for one of these IP addresses, IP Address 99.21. 146.78, revealed subscriber address information to 2480 Larkspur Lane #176, Sacramento, CA, which is a condominium

---

[5] In 2018, the CHS reported that the trailer, or the location where the trailer is stored, that CHAVEZ has at La Victoria Market (**Target Location 2**) may be the place where CHAVEZ is storing his drugs. The CHS further stated that CHAVEZ had a girlfriend who used to stash drugs at CHAVEZ'S direction.
Agents have not observed any indication of anyone else living at **Target Location 3**, other than Maria Estela DELGADO, as described above.

address managed by Timberlake Owners Association.  Agents requested information regarding 2480 Larkspur Lane #176, Sacramento, CA, and staff disclosed that the assigned parking space for the address was space 59.  On January 14, 2022, agents observed PONCE's vehicle, **Target Vehicle 5**, parked in assigned parking space 59.  On March 2, 2022, agents observed another of PONCE's vehicles, **Target Vehicle 6**, parked in parking space 59.

52.   On March 7, 2022, agents attempted to conduct an undercover DoorDash at #176.  The agent traveled up the single-entry staircase to #175 and #176.  The single staircase is the only entry and exit point for the occupants.  After several unsuccessful knocks at #176, the agent knocked at #175, an unknown female opened the door and stated two males resided in #176.[6]  Surveillance continued after the agent departed the location.  Later in the day, detectives witnessed PONCE walk down the staircase of #175 and #176.  PONCE entered **Target Vehicle 6** parked in parking space 59 whereupon he exited the condominium.  PONCE drove his vehicle to 3505 Condor CT., Sacramento, CA (**Target Location 1**), where he exited and entered the residence.

53. On March 12, 2022, surveillance units witnessed PONCE arrive at **Target Location 4** and park in space 59.  PONCE was later seen exiting the stairway that led to his apartment carrying a laundry basket full of clothes and driving to a laundromat.

54.   Based on the above information and totality of the investigation, I believe PONCE currently resides at 2480 Larkspur Lane #176, Sacramento, CA (**Target Location 4**).

---

[6] Saman Dehghani Mohammadi is listed as the subscriber for the internet service provided to **Target Location 4**.  Agents do not know whether Mohammadi is the other male whom the resident of #175 stated lives at **Target Location 4**.

**Target Location 5: 1412 Thomasnell Way, Ceres, CA**

55.  On March 1, 2022, law enforcement checks conducted on Mario GONZALEZ revealed address 1412 Thomasnell Way, Ceres, CA (**Target Location 5**) as a primary address.  Agents believe based on a law enforcement financial records database inquiry that Griselda Guadalupe Orozco NARANJO, believed to be GONZALEZ's wife (whom GONZALEZ told law enforcement was also a money courier during the October 15, 2021 traffic stop described above), likely also lives at **Target Location 5**.  Agents have not observed any indication of anyone else living at the residence.

56.  Beginning in or around July 2021, and continuing through March 2022, agents received geolocation data for **TT3** (GONZALEZ) pursuant to federal "ping" warrants.  In reviewing geolocation data on **TT3**, agents determined that **TT3** was typically in the area of **Target Location 5** during the evening and night hours, confirming that **Target Location 5** is GONZALEZ's primary residence.  Furthermore, after GONZALEZ made trips to Vancouver, WA, or Sacramento, CA, or even Mexico, he always returned to the area of **Target Location 5** according to geolocation data for **TT3**.

57.  On March 7, 2022, geolocation information for **TT3**, revealed **TT3** was near the San Ysidro Port of Entry ("POE").  Border crossing records showed that on March 9, 2022, C. CAMPOS crossed the Otay Mesa POE in **Target Vehicle 9**.  On March 11, 2022, geolocation information for **TT3** indicated **TT3** was moving north from the San Ysidro POE.  At approximately 8:29 pm, surveillance units witnessed GONZALEZ arrive in **Target Vehicle 9** and an unknown female arrive in **Target Vehicle 8** at **Target Location 5** at the same time. The female stationed **Target Vehicle 8** inside the garage and Gonzalez

stationed his truck on the driveway of the residence.  GONZALEZ was then seen entering

the garage, and both GONZALEZ and the female were observed inside of the garage

before the garage door closed.  Based on the above information and totality of the

investigation, I believe GONZALEZ currently resides at 1412 Thomasnell Way, Ceres, CA

(**Target Location 5**).

### Training and Experience Regarding Drug Trafficking and Drug Traffickers

58.  As a result of my experience and training, I have learned that traffickers who deal in

various quantities of controlled substances, or those that assist in that venture, maintain and

tend to retain accounts or records of those transactions.  Such records detail amounts

outstanding, owed, or expended, along with records tending to indicate the identity of co-

conspirators. These records may be kept on paper or contained in memory calculators or

computers.  It is also my experience that these traffickers tend to keep these accounts and

records in their residence and in the areas under their control.  It is my training and

experience, that in the case of drug dealers, evidence is likely to be found where the dealers

live.  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).   It is also my

training and experience that where criminal activity is long-term or ongoing, equipment

and records of the crime will be kept for some period of time.  United States v. Greany, 929

F.2d 523, 525 (9th Cir. 1991).

59.  Based upon my experience and training, I have learned that drug traffickers often place

their assets in names other than their own to avoid detection of those assets by law

enforcement and the Internal Revenue Service (IRS); that those persons are commonly

family members, friends, and associates who accept title of assets to avoid discovery and

detection; that traffickers also often place assets in the ownership of corporate entities to

avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, drug traffickers keep records of those registrations and transactions in their residence.

60.  I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

61.  In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

62. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and

which they have free and ready access to, drugs, including but not limited to in this case, cocaine, which they intend to distribute.  It is my experience that drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

63. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

64.  In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

65.  From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the

property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect. The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

66.  In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution.  During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

67. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven

countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

68. In establishing these entities, the traffickers sometimes must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

69. Individuals involved in the distribution of cocaine and other illegal drugs often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their cocaine and other drug trafficking activities, and that such items often identify co-conspirators in their drug trafficking activities.

70. It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up drug deals, records relating to these activities will be found stored in the cellular telephone.

71. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message.  Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones.  Mobile telephones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics

trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business.  Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate.  Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime.  Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

72.  From my training and experience, I know that individuals that drug traffickers also frequently use computers and other electronic media to conduct their trade and to keep track of drug inventories, proceeds, and debts.  This information can be found in electronic records that might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

73.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

74.  Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

75.  In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

76.  Similarly, files related to the purchasing and selling of controlled substances, as well as the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation

of the data, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache". The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

77.  "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

78. Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal

evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

79.  Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

  a)   The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

37

considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b)   The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c)    Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the

38

storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d)  Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

80.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

81.  The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts, or their modifications may have been created or stored.

82.  As described above and in Attachments A-1 through A-17 and B, this Affidavit seeks permission to search and seize things that are related to the cocaine trafficking conspiracy between CHAVEZ, PONCE, GONZALEZ, and their co-conspirators and associates, in whatever form such things are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.

Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

83. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including cocaine, as well as the proceeds from such illegal operations.

84. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

85. Individuals involved in illicit activities that generate large amounts of income will conduct cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000 to avoid reporting requirements, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal activities, the use of wire remitter companies to convert into wire transfers below reporting requirements and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering."

86. Individuals involved in illicit activities normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences and place of business. Furthermore,

individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accountants to complete financial statements and tax returns for their business and personal tax returns.

87.  Individuals involved in illicit activities maintain evidence of their crimes for long periods of time.  The evidence may be necessary business records that must be kept for information reporting purposes, such as for state and Federal tax returns, and loan applications.  The evidence may also be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence that may be retrievable by a trained forensic computer expert.

88.  Individuals who amass proceeds from both legal and illegal activities routinely attempt to further that conduct, and/or in the case of illegal activities conceal the existence and source of their funds, by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc.

Records of such instruments are routinely maintained at the individual's residence or place of business.

89.  The net worth/source and application of funds analysis show that a person's known expenditures and/or accumulation of assets substantially exceed their legitimate source of income to prove that the suspect is engaged in either legal or illegal money generating activities, such as real estate investing or narcotics trafficking.  The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his/her purported criminal enterprise, to his/her net worth at the approximate time of his/her cessation of criminal activity.

90.  The source and application of the funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his/her legitimate source of income.  Both analysis require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year).  Other than assisting in the net worth/source and application of funds analysis, a financial profile of a suspect prior to the purported criminal activity that are consistent with a person generating income from illegal activities (e.g., drug or firearms trafficking), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial life-style, net worth/source and application of funds analyses, and underlying financial documents necessary for such analysis are admissible evidence under federal case law.  Thus, there is a bona fide reason for the need for such documents to be taken during the execution of a search warrant.

91.  Individuals involved in drug trafficking often maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.  These individuals conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities, in their residences, offices, garages, automobiles, storage buildings, and safety deposit boxes.

92.  **REQUEST FOR SEALING:**  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.


**[CONTINUED ON NEXT PAGE]**

## **Conclusion**

93.  The facts in this Affidavit demonstrate probable cause to believe that Jose CHAVEZ, Denis PONCE, and Mario GONZALEZ, and other co-conspirators and associates are involved in the above-described offenses, and that evidence, fruits, and instrumentalities of these offenses, as described in Attachment B, are likely to be found at the locations and in the vehicles listed in Attachments A-1 through A-17.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

_____
Orcina A. Pacheco-Garcia
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to me telephonically on March ___, 2022.

_____
Hon. Deborah Barnes
United States Magistrate Judge

Approved as to form:

 _/s/ David Spencer_____
David W. Spencer
Assistant United States Attorney

## **Attachment A-1**
### DESCRIPTION OF LOCATION TO BE SEARCHED



The property to be searched is 3505 Condor Ct, Carmichael, CA 95608 and is pictured above and identified as follows:  A one-story residence with brown coloring and a partial brick exterior.  There is a garage located at the front of the house.  The premises to be searched includes all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, storage rooms, or outbuildings of any kind located thereon to which the occupants of 3505 Condor Ct, Carmichael, CA 95608 have access.

## **Attachment A-2**
DESCRIPTION OF LOCATION TO BE SEARCHED



The property to be searched is 2533 Del Paso Boulevard, Sacramento, California, and is pictured above and identified as follows:  A two-story business, the building has a "LA VICTORIA" sign with red letters in the front.  There are two connected glass metal front doors. The premises to be searched includes all office rooms, compartments, and storage rooms or areas, including basements and/or attics and safes that are located thereon.

# **Attachment A-3**
## DESCRIPTION OF LOCATION TO BE SEARCHED



The property to be searched is 2556 Rio Linda Boulevard, Sacramento, California, and is pictured above and identified as follows: A one-story residence with brown coloring. There is a black iron gate surrounding the entire property with a back alley to Del Paso Rio Linda Blvd. Various large vehicles are parked inside of the locked gate of the residence. The premises to be searched includes all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, vehicles parked inside of the premises, storage rooms, or outbuildings of any kind located thereon to which the occupants of 2556 Rio Linda Boulevard, Sacramento, California have access.

# **Attachment A-4**
## DESCRIPTION OF LOCATION TO BE SEARCHED

 

The property to be searched is 2480 Larkspur Lane, #176, Sacramento, California, and is pictured above and identified as follows:  A one-story condominium with brown coloring. Condo #176 is located on the left side of the second floor.  There is a wooden sign on the stairway with 176 and 175 for two upstairs condos.  The premises to be searched includes all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, storage rooms, or outbuildings of any kind located thereon two which the occupants 2480 Larkspur Lane, #176, Sacramento, California have access.

# **Attachment A-5**
### DESCRIPTION OF LOCATION TO BE SEARCHED



The property to be searched is 1412 Thomasnell Way, Ceres, California, and is pictured above and identified as follows:  A one-story residence with brown coloring.  There are two garage doors at the front of the house.  The numerals 1412 are located in the front of the home. The premises to be searched includes all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, storage rooms, or outbuildings of any kind located thereon to which the occupants 1412 Thomasnell Way, Ceres, California have access.

# **Attachment A-6**

TARGET VEHICLE 1 – 2018 Volkswagen sedan, white with license plate **8HKN876**, registered to Jose CHAVEZ at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 1 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-7**

TARGET VEHICLE 2 –2016 Honda, grey with license plate **8MHH330**, registered to Jose M CHAVEZ at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 2 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-8**

TARGET VEHICLE 3 –2020 Honda SUV, black with license plate **8NKA590**, registered to Jose M CHAVEZ at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 3 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-9**

TARGET VEHICLE 4- 2017 Honda Silver, silver with license plate **8KIV189**, registered to Jose M CHAVEZ at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 4 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-10**

TARGET VEHICLE 5- 2017 Honda Silver, silver with license plate **7UWH104**, registered to Denis Castillo, at 7987 Old Winding Way, Fair Oaks, CA.

B. The search of TARGET VEHICLE 5 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-11**

TARGET VEHICLE 6- 2007 Saturn grey, with license plate 6WCJ577 registered to Denis Ponce Castillo, at 3825 Presidio St, Sacramento, CA.

B. The search of TARGET VEHICLE 6 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-12**

TARGET VEHICLE 7- 2008 Toyota Tacoma with license plate 81749E3, registered to Denis Ponce, at 3825 Presidio St, Sacramento, CA.

B. The search of TARGET VEHICLE 7 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-13**

TARGET VEHICLE 8- 2021 Toyota Camry, white with license plate **8UHG728**, registered to Mario Naranjo, at 1412 Thomasnell Way, Ceres, CA.

B. The search of TARGET VEHICLE 8 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# Attachment A-14

TARGET VEHICLE 9 – 2017 GMC, red truck, CA license # 98560C2, registered to Jose CHAVEZ, at 3505 Condor Court, Carmichael, CA.

**B.**　　The search of TARGET VEHICLE 9 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-15**

TARGET VEHICLE 10 - 2007 Toyota, silver Tacoma, CA license # 36821B3, registered to Jose CHAVEZ, at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 10 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# Attachment A-16

TARGET VEHICLE 11- 1994 Jaguar, CA license plate **3KST304**, registered to Jose M CHAVEZ at 3505 Condor Court, Carmichael, CA.

B. The search of TARGET VEHICLE 11 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# **Attachment A-17**

TARGET VEHICLE 12- 1998 Ford truck CA license plate **8V96908**, registered to Jose M CHAVEZ at 2533 Del Paso Blvd., Sacramento, CA.

B. The search of TARGET VEHICLE 12 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.

# Attachment B
## Items to be Seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 21 U.S.C. §§ 841(a)(1) and 846 – Conspiracy to distribute and possess with intent to distribute cocaine.

- 21 U.S.C. § 841(a)(1) – Distribution and possession with intent to distribute cocaine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including cocaine or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase cocaine during this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and

certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person; and

11.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

12. Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

> a.  any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the Target Offenses;

> b.  any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

> c.  any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

> d.  any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

> e.  any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

> f.  any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    g. any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

13. For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

    a. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of these digital devices or other electronic storage media or on a server and associated with these digital devices or other electronic storage media, including:

        i. Incoming call history;
        ii. Outgoing call history;
        iii. Missed call history;
        iv. Outgoing text messages;
        v. Incoming text messages;
        vi. Draft text messages;
        vii. Telephone book;
        viii. Emails;
        ix. Data screen or file identifying the telephone number associated with the mobile telephone searched;
        x. Data screen, file, or writing containing serial numbers or other information to identify the electronic device searched;
        xi. Voicemail;
        xii. User-entered messages (such as to-do lists); and
        xiii. Stored media such as photographs or video.

    b. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

    c. All information and records related to violations of 21 U.S.C. § 841(a) (drug trafficking) and/or 21 U.S.C. § 846 (conspiracy to traffic drugs), including but not limited to:

        i. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;
        ii. Data, information, or documents related to the manufacture of controlled substances, including the acquisition, possession, and use of equipment, paraphernalia, chemicals, and materials used in the manufacturing process;
        iii. lists of customers and related identifying information;
        iv. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
        v. any information related to sources of drugs or drug manufacturing materials and equipment (including names, addresses, phone numbers, email addresses, or any other identifying information);

vi. any information recording schedule or travel;

vii. all bank records, checks, credit card bills, account information, and other financial records;

viii. data, information, or documents related to the receipt of proceeds from controlled substances distribution and the transfer, investment, control, and disposition of those proceeds;

ix. records of Internet Protocol addresses used;

x. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xi. any communications related to drug trafficking;

xii. stored media such as photographs or video.

d.  evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

e.  evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

f.  evidence of the lack of such malicious software;

g.  evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

i.  evidence of the times the digital device or other electronic storage media was used;

j.  passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

k.  documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

l.  contextual information necessary to understand the evidence described in this attachment.

14.  Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a.  routers, modems, and network equipment used to connect computers to the internet;

b.  records of Internet Protocol addresses used;

c.  records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.

## <u>United States v. Chavez, et al.</u>
### Penalties for Criminal Complaint

**<u>Defendants</u>**
**Jose Manuel CHAVEZ Zepeda**
**Denis Zacarias PONCE Castillo**


**<u>COUNT 1:</u>**          **ALL DEFENDANTS**

VIOLATION:          21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute and Possess with
                    Intent to Distribute at least 500 grams of a Mixture and Substance
                    containing Cocaine

PENALTIES:          Mandatory minimum of 5 years in prison and a maximum of up to 40
                    years in prison; or
                    Fine of up to $5,000,000; or both fine and imprisonment
                    Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**<u>COUNT 2:</u>**          **ALL DEFENDANTS**

VIOLATION:          21 U.S.C. § 841(a)(1) – Distribution of at least 500 grams of a Mixture
                    and Substance containing Cocaine

PENALTIES:          Mandatory minimum of 5 years in prison and a maximum of up to 40
                    years in prison; or
                    Fine of up to $5,000,000; or both fine and imprisonment
                    Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)